**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTHERN CALIFORNIA RIVER
WATCH, a non-profit corporation,
      *Plaintiff-Appellee,*

      v.

CITY OF HEALDSBURG, and Does
1-10 inclusive.
      *Defendant-Appellant.*

No. 04-15442

D.C. No.
CV-01-04686-WHA

ORDER AND
OPINION

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted
November 16, 2005—San Francisco, California

Filed August 6, 2007

Before: Mary M. Schroeder, Chief Judge, Jerome Farris and
Consuelo M. Callahan, Circuit Judges.

Opinion by Chief Judge Schroeder

**COUNSEL**

Peter W. McGaw, Archer Norris, Walnut Creek, California, for the appellant.

Charles M. Tebbutt, Western Environmental Law Center, Eugene Oregon and Jack Silver, Law Offices of Jack Silver, Santa Rosa, California, for the appellee.

**ORDER**

The opinion filed August 10, 2006, slip op. 9299, and appearing at 457 F.3d 1023 (9th Cir. 2006) is withdrawn, and a new opinion will be filed in its stead.

The Petitions for Rehearing and Rehearing En Banc are otherwise DENIED, no further petitions for rehearing will be accepted.

**OPINION**

SCHROEDER, Chief Judge:

Defendant/Appellant City of Healdsburg ("Healdsburg") appeals the district court's judgment in favor of Plaintiff/ Appellee Northern California River Watch ("River Watch"), an environmental group, in this litigation under the Clean Water Act ("CWA"). Plaintiff alleges that Healdsburg, without first obtaining a National Pollutant Discharge Elimination System ("NPDES") permit, violated the CWA by discharging sewage from its waste treatment plant into waters covered by the Act. Healdsburg discharged the sewage into a body of water known as "Basalt Pond," a rock quarry pit that had filled with water from the surrounding aquifer, located next to the Russian River.

The issue is whether Basalt Pond is subject to the CWA because the Pond, containing wetlands, borders additional wetlands that are adjacent to a navigable river of the United States. The district court held that discharges into the Pond are discharges into the Russian River, a navigable water of the United States protected by the CWA. The court followed the United States Supreme Court decision in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985).

The Supreme Court, however, has now narrowed the scope of that decision. *See Rapanos v. United States*, 126 S.Ct. 2208 (2006). In a 4-4-1 decision, the controlling opinion is that of Justice Kennedy who said that to qualify as a regulable water under the CWA the body of water itself need not be continuously flowing, but that there must be a "significant nexus" to a waterway that is in fact navigable.

In light of *Rapanos*, we conclude that Basalt Pond possesses such a "significant nexus" to waters that are navigable in fact, not only because the Pond waters seep into the navigable Russian River, but also because they significantly affect

the physical, biological, and chemical integrity of the River. We affirm the district court's holding that Basalt Pond is subject to the CWA. We also affirm the district court's ruling that neither the waste treatment system nor the excavation operation exceptions in the Act apply to Healdsburg's discharges.

## BACKGROUND

The Clean Water Act of 1972 provides the foundation for this case. *See* 33 U.S.C. § 1251. The primary objective of the CWA is to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To effectuate this objective, one of the CWA's principal sections strictly prohibits discharges of pollutants into the "navigable waters of the United States" without an NPDES permit from the Environmental Protection Agency ("EPA"). 33 U.S.C. § 1311(a). The CWA defines the term "navigable waters" to mean "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

Basalt Pond was created in approximately 1967 when the Basalt Rock Company began excavating gravel and sand from land near the Russian River. After the top soil was ripped away, large machines tore out rock and sand. The result was a pit. The pit filled with water up to the line of the water table of the surrounding aquifer. Today, Basalt Pond, measuring one half mile in length and a quarter mile in breadth, contains 58 acres of surface water. The Pond lies along the west side of the Russian River, separated from the River by wetlands and a levee.

It is undisputed that the Russian River is a navigable water of the United States. Its headwaters originate in Mendocino County, California. Its main course runs about 110 miles, flowing into the Pacific Ocean west of Santa Rosa.

The horizontal distance between the edge of the River and the edge of the Pond varies between 50 and several hundred

feet, depending on the exact location and the height of the river water. Usually, there is no surface connection, because the levee blocks it and prevents the Pond from being inundated by high river waters in the rainy season.

In 1971, Healdsburg built a secondary waste-treatment plant on a 35-acre site located on the north side of Basalt Pond about 800 feet from and west of the Russian River. Prior to 1978, Healdsburg discharged the plant's wastewater into another water-filled pit located to the north. In 1978, Healdsburg began discharging into Basalt Pond. Although Healdsburg did not obtain an NPDES permit, it received a state water emission permit as well as permission from Syar Industries, Inc., the current owner and manager of land and operations at Basalt Pond.

The wastewater was discharged into Basalt Pond from the plant at about 420 to 455 million gallons per year between 1998 and 2000. The volume of the Pond itself is somewhat larger — 450 to 740 million gallons. The annual outflow from the sewage plant, therefore, is sufficient to fill the entire Pond every one to two years. Basalt Pond would, of course, soon overflow in these circumstances were it not for the fact that the Pond drains into the surrounding aquifer.

Pond water in the aquifer finds its way to the River over a period of a few months and seeps into the River along as much as 2200 feet of its banks. The district court made specific findings as to the impact of the wastewater ultimately draining into the Russian River. First, the district court noted that not all the sewage in the wastewater reached the River. The wastewater is partially cleansed as it passes through the bottom and sides of the Basalt Pond. Healdsburg refers to this process as "polishing" or "percolation." The wetlands around Basalt Pond also help cleanse the outflow by passing the effluent through the wetlands sediment. The filtration is effective in reducing biochemical oxygen demand and removing some pollutants, but the filtration is not perfect.

The district court found that the concentrations of chloride in the groundwater between the Pond and the Russian River are substantially higher than in the surrounding area. Chloride, which already exists in the Pond due to naturally occurring salts, reaches the River in higher concentrations as a direct result of Healdsburg's discharge of sewage into the Pond. Mr. John Lambie, a water expert for Healdsburg, testified at trial that the average concentration of chloride appearing upstream in the River is only 5.9 parts per million. In contrast, the average concentration of chloride seeping from Basalt Pond into the River is 36 parts per million. At a monitoring well between the Pond and the River, the underground concentration is diluted to some 30 parts per million. Ultimately, a chloride concentration of 18 parts per million appears on the west side of the River. The district court thus found that chloride from the Pond over time makes its way to the River in higher concentrations than naturally occurring in the River. This finding was further supported by Dr. Larry Russell, one of River Watch's trial experts.

Plaintiffs filed this suit on December 4, 2001, alleging that Healdsburg is violating the CWA by discharging wastewater into Basalt Pond. After a four day trial, the district court made findings of fact to support its holding that Healdsburg discharged sewage into a protected water of the United States in violation of the CWA. The court's holding was premised on the legal conclusion that Basalt Pond is a "water of the United States" within the meaning of the CWA. *See* 2004 WL 201502 (N.D. Cal.). This appeal followed.

## DISCUSSION

### A. *Wetlands Constituting Waters of the United States*

[1] Congress passed the Clean Water Act in 1972. The Act's stated objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 33 U.S.C. § 1251(a). To that end, the statute, among other

things, prohibits "the discharge of any pollutant by any person" except as provided in the Act. § 1311(a).

**[2]** After the CWA was passed, an issue arose concerning the extent to which wetlands adjacent to navigable waters constitute "waters of the United States." In 1978, the Army Corps of Engineers ("ACOE") issued regulations defining "waters of the United States" to include "adjacent wetlands." 33 C.F.R. § 328.3(a)(7). The regulations specifically provide that "[t]he term 'waters of the United States' means," among other things, "[w]etlands adjacent to waters." *Id.* The regulations further specify that "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.' " 33 C.F.R. § 328.3(c).

The Supreme Court has since confirmed that regulable waters of the United States include tributaries of traditionally navigable waters and wetlands adjacent to navigable waters and their tributaries. *Riverside Bayview Homes*, 474 U.S. 121; 33 C.F.R. 328.3(a)(1),(4),(7). The only question reserved in *Riverside Bayview Homes* was the issue of CWA jurisdiction over truly isolated waters. *See Rapanos*, 126 S.Ct. at 2255 n.3.

Thus, the first issue before us is whether Basalt Pond and the wetlands in it are isolated waters, or whether they constitute covered wetlands within the meaning of the regulations and within the scope of *Riverside Bayview Homes* and *Rapanos*.

**[3]** The applicable regulations define wetlands as "those areas that are inundated or saturated by surface or groundwater." *See* 33 C.F.R. § 328.3(b). The record here reflects that the Russian River and surrounding area, including the Pond itself, rest on top of a vast gravel bed extending as much as sixty feet into the earth. The gravel bed is a porous medium, saturated with water. Through it flows an equally vast underground aquifer. This aquifer supplies the principal pathway

for a continuous passage of water between Basalt Pond and the Russian River. Beneath the surface, water soaks in and out of the Pond via the underground aquifer. This action is continuous, 24 hours a day, seven days a week, 365 days a year. Indeed, the parties have stipulated that the Pond and the River overlie the same unconfined aquifer and that the land separating the two is saturated below the water table.

**[4]** The Basalt Pond and its surrounding area are therefore regulable under the Clean Water Act, because they qualify as wetlands under the regulatory definition. The district court explicitly found that the Pond is not only surrounded by extensive wetlands, which connect to the Russian River, but also that the Pond's shoreline has receded so substantially that much of the area that was originally Basalt Pond has turned into wetland. This case is thus different than our recent decision in *San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700 (9th Cir. 2007), because here, the Pond is not isolated; it contains and is surrounded by wetlands, rendering it regulable under the CWA.

The remaining question is whether, under *Rapanos* and its antecedents, Basalt Pond is a "water of the United States" because it is sufficiently adjacent to the navigable Russian River to confer jurisdiction or alternatively because it has a substantial nexus to the River.

The Supreme Court has not yet agreed upon a satisfactory explanation of when wetlands are sufficiently adjacent to navigable waters to confer CWA jurisdiction. The leading case addressing the issue is *Riverside Bayview Homes*, 474 U.S. 121, which was decided in 1985. The Supreme Court there upheld CWA jurisdiction over wetlands that directly abutted a navigable creek. The Court held that "the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act." *Id*. at 134.

**[5]** In *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (*SWANCC*), the Supreme Court again interpreted the CWA term "navigable waters" and held that isolated ponds and mudflats, unconnected to other waters covered by the Act, were not "waters of the United States, because they were either not sufficiently adjacent to navigable waterways or did not have a substantial nexus to such waters." The case involved ponds that had been formed as a result of an abandoned sand and gravel pit mining operation, but were not "adjacent wetlands." The ACOE regulations defined the ponds nevertheless to be "waters of the United States," because they were "used as habitat by other migratory birds which cross state lines." 40 C.F.R. § 328.3(a)(3)(b). Under this "Migratory Bird Rule," ponds that are isolated from navigable waters may constitute "waters of the United States" if they are used as habitat by migratory birds. The Supreme Court rejected that theory and held that the CWA does not protect isolated ponds without a significant nexus to navigable water. The Court explained that, "[i]t was the significant nexus between wetlands and 'navigable waters' that informed our reading of the [Act] in *Riverside Bayview Homes*." *Id.* at 167.

The Supreme Court in *SWANCC*, therefore, invalidated the Migratory Bird Rule but did not purport to reconsider its prior holding regarding adjacent wetlands in *Riverside Bayview Homes*. In *Baccarat Fremont Developers, LLC v. U.S. Army Corps of Engineers*, 425 F.3d 1150 (9th Cir. 2005), we expressly recognized that *SWANCC* invalidated the ACOE's Migratory Bird Rule, but did not overrule *Riverside Bayview Homes*. Our conclusion in *Baccarat* is consistent with other circuits that have also held that *SWANCC* did not overrule *Riverside Bayview Homes*. *See United States v. Hubenka*, 438 F.3d 1026 (10th Cir. 2006); *United States v. Johnson*, 437 F.3d 157 (1st Cir. 2006).

In the last term the Supreme Court also discussed the intersection between *Riverside Bayview Homes* and *SWANCC*.

*Rapanos*, 126 S.Ct. 2208. The *Rapanos* decision involved two consolidated cases, *United States v. Rapanos*, 376 F.3d 629 (6th Cir. 2004) (*Rapanos I*), and *Carabell v. U.S. Army Corps of Engineers*, 391 F.3d 704 (6th Cir. 2004).

The first consolidated case, *Rapanos I*, involved three land parcels near Midland, Michigan. The first parcel, known as the Salzburg site, consisted of roughly 230 acres. The Salzburg site included 28 acres of wetlands. The district court found, on the basis of expert testimony, that water from the site spilled into the Hoppler Drain, which carried water into the Hoppler Creek and ultimately into the Kawkawlin River, which is navigable. The second parcel, known as the Hines Road site, consisted of 275 acres, which included 64 acres of wetlands. These wetlands had a surface-water connection to the Rose Drain, which carried water into the Tittabawassee River, a navigable waterway. The final parcel, called the Pine River site, consisted of some 200 acres. This site included 49 acres of wetlands, and a surface water connection linked the wetlands to the nearby Pine River, which flowed into Lake Huron. The wetlands at issue in all three parcels were neither directly adjacent to nor entirely isolated from a navigable water of the United States.

The United States brought an action against the Rapanos petitioners for civil violations of the CWA. Specifically, the government claimed that petitioners discharged fill into protected wetlands, failed to respond to requests for information, and ignored administrative compliance orders. After a 13-day bench trial, the district court made factual findings upholding the Corps' jurisdiction over wetlands on the three parcels. On the merits the court ruled in the government's favor, finding that violations occurred at all three sites. The United States Court of Appeals for the Sixth Circuit affirmed, 376 F.3d 629 (2004). The other consolidated case, *Carabell*, similarly involved discharges into wetlands that connected through a series of waterways to a navigable water of the United States,

and the Sixth Circuit similarly held that the wetlands were covered by the Act. 391 F.3d 704 (6th Cir. 2004).

In *Rapanos*, a 4-4-1 plurality opinion, the Supreme Court addressed how the term "navigable waters" should be construed under the Act. The plurality, written by Justice Scalia for four Justices, would have reversed on the grounds that only those wetlands with a continuous surface connection to bodies that are "waters of the United States" are protected under the CWA. Justice Stevens, writing the dissent for four Justices, would have affirmed on the grounds that even wetlands not directly adjacent to navigable waters, but adjacent to tributaries of navigable waters, are protected under the CWA. Justice Stevens also argued that *Riverside Bayview Homes* is still the controlling precedent and does not require a "significant nexus" test.

Justice Kennedy, constituting the fifth vote for reversal, concurred only in the judgment. His concurrence is the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases. *See United States v. Gerke*, 464 F.3d 723, 724 (7th Cir. 2006); *see also Rapanos*, 126 S. Ct. at 2265 n.13 (J. Stevens dissenting). Thus, as the Seventh Circuit extensively explained in *Gerke*, 464 F.3d 724, Justice Kennedy's concurrence provides the controlling rule of law for our case. *See also Marks v. United States*, 430 U.S. 188, 193 (1997).

Justice Kennedy said that when wetlands are isolated, or adjacent only to a non-navigable tributary of a navigable waterway, those wetlands are regulable under the CWA only if there is a significant nexus between the wetlands at issue and the navigable waterway. *Rapanos*, 126 S. Ct. at 2248. He explained that a significant nexus exists "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos*, 126 S.Ct. at 2248.

"When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.' " *Id*.

In addressing whether a hydrological connection satisfies the "significant nexus" test, Justice Kennedy explained that a "mere hydrologic connection should not suffice in all cases; the connection may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood." *Id*. at 2251. Rather, the "required nexus must be assessed in terms of the statute's goals and purposes," which are to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id*. at 2248 (internal quotations and citations omitted).

[6] Justice Kennedy thus established a substantial nexus test for the applicability of the Act, concluding that "absent a significant nexus, jurisdiction under the Act is lacking." *Id.* at 2241. But, at the same time, Justice Kennedy also reaffirmed the holding of *Riverside Bayview Homes* that wetlands adjacent to navigable waterways are covered by the Act, saying that by virtue of the "reasonable inference of ecologic interconnnection," assertion of jurisdiction "is sustainable under the Act by showing adjacency alone." *Id.* at 2248. This indicates that a significant nexus may be inferred when wetlands are adjacent to navigable waters.

In this case, we have both. The Pond is part of a larger wetland that is "adjacent" to the River within the meaning of *Riverside Bayview Homes*. There is also a "substantial nexus" present under the analysis of Justice Kennedy in *Rapanos*.

[7] The water from the Pond seeps into the river through both the surface wetlands and the underground aquifer. The district court's findings of fact regarding this hydrological connection support the conclusion that Basalt Pond has a significant effect on "the chemical, physical, and biological integrity" of the Russian River. There is accordingly a sub-

stantial nexus between the Basalt Pond and covered waters sufficient to confer jurisdiction under the Act pursuant to Justice Kennedy's substantial nexus test. *See id.* at 2241.

With respect to the physical effect on the River, there is an actual surface connection between Basalt Pond and the Russian River when the River overflows the levee and the two bodies of water commingle. There is also an underground hydraulic connection between the two bodies, so a change in the water level in one immediately affects the water level in the other. Basalt Pond drains into the aquifer and at least 26 percent of the Pond's volume annually reaches the River itself. Thus, there are several hydrological connections between Basalt Pond's wetlands and the Russian River that affect the physical integrity of the River.

In addition to these physical connections between Basalt Pond and the Russian River, the district court found that there is also a significant ecological connection. The Pond and its wetlands support substantial bird, mammal and fish populations, all as an integral part of and indistinguishable from the rest of the Russian River ecosystem. Many of the bird populations at the Pond are familiar along the River, including cormorants, great egrets, mallards, sparrows, and fish-eaters. Fish indigenous to the River also live in the Pond due to the recurring breaches of the levee. As the district court observed, these facts make Basalt Pond indistinguishable from any of the natural wetlands alongside the Russian River that have extensive biological effects on the River itself.

The district court also found that Basalt Pond significantly affects the chemical integrity of the Russian River by increasing its chloride levels. The chloride from Basalt Pond reaches the River in higher concentrations as a direct result of Healdsburg's discharge of sewage into the pond. Mr. John Lambie testified at trial that the average concentration of chloride appearing upstream in the river is only 5.9 parts per million. In contrast, the average concentration of chloride seeping

from Basalt Pond into the River is 36 parts per million, and the chloride concentration on the west side of the River adjacent to the Pond is 18 parts per million.

[8] In sum, the district court made substantial findings of fact to support the conclusion that Basalt Pond has a significant nexus to the Russian River. The Pond's effects on the Russian River are not speculative or insubstantial. Rather, the Pond significantly affects the physical, biological and chemical integrity of the Russian River, and ultimately warrants protection as a "navigable water" under the CWA. Appellant's discharge of wastewater into Basalt Pond without a permit, therefore, violates the CWA unless it falls within one of the Act's exceptions.

## B.   Waste Treatment System Exception

[9] Appellant claims that even if Basalt Pond constitutes a water of the United States it is exempt from protection under the CWA's waste treatment system exception. The CWA excludes "waste treatment systems" from "waters of the United States." The CWA regulations specifically provide that:

> Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 423.11(m) which also meet the criteria of this definition) are not waters of the United States.

33 C.F.R. § 328.3(a)(8).

Claims of exemption, from the jurisdiction or permitting requirements, of the CWA's broad pollution prevention mandate must be narrowly construed to achieve the purposes of the CWA. *See United States v. Akers*, 785 F.2d 814, 819 (9th Cir. 1986). Furthermore, appellant has the burden to prove that this exception applies to its discharge of wastewater into

Basalt Pond. *See United States v. First City National Bank*, 386 U.S. 361, 366 (1967); *Sierra Club v. Union Oil Company of California*, 813 F.2d 1480, 1484 (9th Cir. 1987) (vacated on other grounds by *Union Oil Co. of California v. Sierra Club*, 485 U.S. 931 (1988)).

The waste treatment system exemption was intended to exempt either water systems that do not discharge into waters of the United States or waters that are incorporated in an NPDES permit as part of a treatment system. *See* 44 Fed. Reg. 32858 (June 1, 1979); *In the Matter of: Borden, Inc./Colonial Sugars*, 1984 1 E.A.D. 895 (E.P.A. 1984). In other words, a permit is not required to discharge pollutants into a self-contained body of water that has no connection to a water of the United States, or into a body of water that is connected to a water of the United States, but that is part of an approved treatment system. The exception was meant to avoid requiring dischargers to meet effluent discharge standards for dis-charges *into* their own closed system treatment ponds. *See* 45 Fed. Reg. 48620-21 (July 21, 1980) (emphasis added). Regu-lations under the CWA, however, still extend to discharges *from* treatment ponds. *Id.* (emphasis added).

**[10]** Basalt Pond may be part of a waste treatment system, but it does not fall under the exemption because it is neither a self-contained pond nor is it incorporated in an NPDES per-mit as part of a treatment system. For these reasons, we hold that Basalt Pond is not a waste treatment system exempt from coverage under the Act.

## C.    The Excavation Operation Exception

Healdsburg also argues that Basalt Pond is exempt from protection under the CWA because it is the site of an ongoing excavation operation. In its preamble to the revisions to its CWA regulation, the ACOE stated:

> For clarification it should be noted that we generally do not consider the following waters to be "Waters of the United States . . . ."
>
> *   *   *
>
> *(e) Waterfilled depressions created in dry land incidental to construction activity and pits excavated in dry land for the purpose of obtaining fill, sand, or gravel unless and until the construction or excavation operation is abandoned and the resulting body of water meets the definition of waters of the United States* (see 33 C.F.R § 328.3(a)).

51 Fed.Reg. 41206, 41217 (1986) (emphasis added). Appellant argues that Basalt Pond is used as part of an active gravel excavation operation and is, therefore, exempt from NPDES regulation. The district court correctly found that there is no merit to this claim.

The district court found that although Syar operates reclamation activities at Basalt Pond, those activities do not constitute an ongoing excavation operation as defined by the ACOE's exemption. The Basalt Rock Company, Syar's predecessor, ceased its excavation of rock or sand from Basalt Pond in 1984. Syar, through its reclamation activities, has never extracted rock or sand from the pond. Rather, Syar has pumped a slurry of sand and sediment *into* Basalt Pond. These findings support the conclusion that all excavation operations at Basalt Pond have been abandoned.

**[11]** Syar does continue to use Basalt Pond as a discharge location for its surface mining operations at other locations, but this does not constitute ongoing excavation operations. The excavation operation exemption applies only to ponds undergoing actual extraction. Basalt Pond is merely tangential to Syar's excavation of other lands. Our holding in *Leslie Salt* clarifies that the ACOE extraction operations exemption does

not apply to a body of water which might be part of general commercial activity. 896 F.2d at 359. Rather, the exemption applies only to bodies of water that are currently and directly under active excavation. *Id*.; *see also Golden Gate Audubon Soc., Inc. v. U. S. Army Corps of Engineers (Audubon II)*, 796 F.Supp. 1306, 1315 (N.D. Cal. 1992). The district court correctly held that the excavation operations exception does not apply in this case.

## CONCLUSION

The Basalt Pond is part of a larger wetland adjacent to the Russian River. It also has a significant nexus to the Russian River, a navigable water of the United States. Healdsburg, by discharging wastewater into the Pond without an NPDES permit, therefore, violated the CWA. The decision of the district court is AFFIRMED.