In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 17-3403

ORCHARD HILL BUILDING COMPANY, doing business as
GALLAGHER & HENRY,

*Plaintiff-Appellant,*

*v.*

UNITED STATES ARMY CORPS OF ENGINEERS,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-06344 — **John Robert Blakey**, *Judge.*

---

ARGUED MAY 29, 2018 — DECIDED JUNE 27, 2018

---

Before BAUER, BARRETT, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* This case concerns just shy of 13 acres of wetlands, which lie in a south-suburban plot of land called the Warmke parcel. Orchard Hill Building Company purchased the Warmke parcel in 1995 with plans for a large-scale residential development. Not wanting to run afoul of the Clean Water Act, Orchard Hill requested a determination

from the United States Army Corps of Engineers that the wetlands (or the "Warmke wetlands") were not jurisdictional "waters of the United States." The Corps decided that they were, and Orchard Hill has spent the last 12 years challenging that decision. We find that the Corps has not provided substantial evidence of a significant nexus to navigable-in-fact waters, and therefore vacate and remand with instructions that the Corps reconsider its determination.

## I. Background

A braid of regulatory, judicial, and administrative events led to the Corps' final claim of jurisdiction over the Warmke wetlands. We start at the beginning.

Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). One of the Act's primary means to that end is its general prohibition on polluting "navigable waters," which it defines as "waters of the United States." *Id.* §§ 1311(a), 1362(7), (12). The Act imposes significant criminal and civil penalties for such pollution, *id.* §§ 1319(c), (d), and obtaining a permit to build on or near such waters can be a lengthy and costly process. Yet the Act does not define what constitutes "waters of the United States." *See, e.g.*, *United States v. Krilich*, 209 F.3d 968, 970 (7th Cir. 2000).

That job falls to the Corps of Engineers and the Environmental Protection Agency—and it has proven "a contentious and difficult task." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 624 (2018); *see also* 33 C.F.R. § 328.3 (the Corps' definition of waters of the United States); 40 C.F.R. § 122.2 (the EPA's definition of waters of the United States). To take a recent example, the agencies' attempt in 2015 to redefine the statutory

phrase resulted in a new administration's swift overhaul and a slew of litigation. *See generally Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 625–27; Executive Order 13778: Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the "Waters of the United States" Rule, 82 Fed. Reg. 12,497 (Feb. 28, 2017); Definition of "Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule, 83 Fed. Reg. 5,200 (Feb. 6, 2018); James Conrad, *Wetlands Jurisdiction*, ENV. SCI. DESKBOOK § 9:1 (2018). This case, however, concerns the Corps' definition of waters of the United States as it existed before 2015. *See Schaefer v. Walker Bros. Enters.*, 829 F.3d 551, 558 (7th Cir. 2016).

The Corps defined waters of the United States broadly to include waters "subject to the ebb and flow of the tide," "rivers" that could be used for interstate recreation or commerce, "tributaries" of such waters, and—most importantly here— "wetlands adjacent to" other waters of the United States, including tributaries. 33 C.F.R. §§ 328.3(a)(1)–(7) (1994).[1] There was (and is) an exemption, though, for "prior converted cropland." *Id.* § 328.3(8). The Corps considers "prior converted cropland" to mean wetlands "manipulated … and cropped" before 1985 (when Congress enacted the "Swampbuster" program, which denies benefits to farmers who use wetlands for farming), but not abandoned of farming use for five or more years.[2] *See* Proposed Rule for the Clean Water

---

[1] All future citations to 33 C.F.R. § 328.3 refer to the version in effect before August 28, 2015.

[2] Because we find that the Corps failed to justify its jurisdictional determination with substantial evidence in the record, we do not decide, as Orchard Hill argues we should, whether the Corps' interpretation of "prior converted cropland" to exclude lands abandoned for five or more

Act Regulator Programs of the Army Corps of Engineers and the Environmental Protection Agency (Proposed Rule), 57 Fed. Reg. 26,894, 26,897–26,900 (June 16, 1992); Clean Water Act Regulatory Programs (Final Rule), 58 Fed. Reg. 45,008, 45,031–45,034 (Aug. 25, 1993).

Despite, or perhaps because of, those definitions, "[i]t is often difficult to determine whether a particular piece of property contains waters of the United States." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1812 (2016). But concerned landowners need not risk fines or endure the permit-application process before deciding whether to build on or alter their property. They can instead seek a "jurisdictional determination" from the Corps as to whether their property contains waters of the United States. 33 C.F.R. §§ 320.1(a)(6), 325.9, 331.2.

Orchard Hill was such a landowner. In 1995, it completed its purchase of the Warmke parcel, a 100-acre former farmland located in Tinley Park, Illinois. Orchard Hill then received permits to build a two-phase residential development on the parcel. The first phase started in 1996, and over the next seven years, Orchard Hill constructed more than a hundred homes. Construction altered the area's water drainage, and about 13 acres pooled with rainwater and grew wetland vegetation. Before starting the second phase and building on those acres—the Warmke wetlands—Orchard Hill sought a jurisdictional determination from the Corps in 2006.

---

years (the "five-year-abandonment limitation") is a legislative rule that violates the Administrative Procedure Act's ("APA") notice-and-comment requirements. 5 U.S.C. § 553.

"The history of the Warmke [wetlands] jurisdictional de-
termination can be described as lengthy, contentious and
complex," as a Corps district engineer aptly put it.[3] The
Warmke wetlands, like all of the Warmke parcel, are sur-
rounded by residential development. The closest navigable
water (as that phrase is literally understood, meaning naviga-
ble-in-fact) is the Little Calumet River, which is 11 miles away.
In between the Warmke wetlands and the Little Calumet
River are man-made ditches, open-water basins, sewer pipes,
and the Midlothian Creek—a tributary of the Little Calumet
River. The assigned district engineer determined the Warmke
wetlands were adjacent to that tributary, and thus waters of
the United States. *See* 33 C.F.R. §§ 283.3(a)(5), (7). That deter-
mination rested on the fact that the Warmke wetlands
drained, by way of sewer pipes, to the Midlothian Creek. Or-
chard Hill appealed that decision, pursuant to its regulatory
right. *See id.* §§ 331.6(a), 331.7(a), 331.3(a)(1).

While that appeal was pending, the Supreme Court issued
a landmark decision paring back the Corps' jurisdictional
reach. *Rapanos v. United States*, 547 U.S. 715 (2006), involved
two consolidated appeals from decisions upholding jurisdic-
tional determinations. Both cases posed the question: When
do wetlands that are not adjacent to waters that are navigable-
in-fact constitute waters of the United States? *Rapanos* did not
produce a majority opinion, and without one to definitively
answer the question, we have held that Justice Anthony Ken-
nedy's concurrence controls. *United States v. Gerke Excavating,*

---

[3] District engineers perform first-level jurisdictional reviews, and di-
vision engineers review appeals of those determinations. *See* 33 C.F.R.
§§ 320.1(a)(2), 325.9, 331.3(a)(1). Where that distinction is not relevant, we
refer generally to the Corps.

*Inc.*, 464 F.3d 723, 724–25 (7th Cir. 2006) (per curiam); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999–1000 (9th Cir. 2007); *United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007).[4]

Justice Kennedy decided that a wetland's adjacency to a tributary of a navigable-in-fact water is alone insufficient to make the wetland a water of the United States. Instead, "the Corps' jurisdiction over [such] wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense." *Rapanos*, 547 U.S. at 779. He explained:

> [W]etlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

*Id.* at 780. The Corps, Justice Kennedy wrote, must make this determination "on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries." *Id.* at 782.

---

[4] Some of our sister courts have concluded that the Corps can establish jurisdiction by using either the standard Justice Kennedy explained or the standard described in Justice Antonin Scalia's plurality opinion. *See United States v. Donovan*, 661 F.3d 174, 176, 182 (3d Cir. 2011); *United States v. Bailey*, 571 F.3d 791, 798–99 (8th Cir. 2009); *United States v. Johnson*, 467 F.3d 56, 64–66 (1st Cir. 2006). Neither party asks us to revisit our decision in *Gerke*, and we see no reason to do so.

After *Rapanos*, the Corps, too, decided to follow Justice Kennedy's significant-nexus test. In late 2008, it published internal guidance titled Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (the "*Rapanos* Guidance"). The *Rapanos* Guidance interprets "similarly situated lands" in the significant-nexus test to mean all "wetlands adjacent to the same tributary," because "such wetlands are physically located in a like manner." It instructs the Corps to determine first if any such adjacent wetlands exist, and if so, to "consider the flow and functions of the tributary together with the functions performed by all the wetlands adjacent to that tributary in evaluating whether a significant nexus is present."

In light of *Rapanos*, the Corps' division engineer remanded the 2006 jurisdictional determination of the Warmke wetlands for further review. Between 2008 and 2010, the district engineer reviewed the wetlands' soil composition, and in March 2010, he made a site visit. There, the district engineer observed an "intermittent flow" of water from the Warmke wetlands to the Midlothian Creek. The district engineer did not test or sample the Warmke wetlands' composition, but based on the observed hydrological connection, he again concluded that the Corps had jurisdiction over the wetlands. Orchard Hill filed an appeal, which the Corps denied.

That might have been the end of the administrative road, but for another federal-court decision. In September 2010, a district court set aside a Corps rule that excluded "non-agricultural" land from the prior-converted-cropland exemption (a rule which the Corps devised after and apart from its five-year-abandonment limitation), reasoning that it was a legislative rule that had not gone through notice-and-

comment under the APA. *New Hope Power Co. v. U.S. Army Corps of Eng'rs*, 746 F. Supp. 2d 1272, 1276, 1281–84 (S.D. Fla. 2010). Relying on that decision, Orchard Hill asked the district engineer to reconsider his jurisdictional determination and decide whether the Warmke wetlands should fall within the exemption. The district engineer agreed to revisit his decision, but again determined the Corps had jurisdiction over the Warmke wetlands. This determination noted that *New Hope* had left in place the exemption's five-year-abandonment limitation, and that the Warmke wetlands had been vacant and unused since the completed sale to Orchard Hill. *See New Hope*, 746 F. Supp. 2d at 1282.

The reconsidered determination also elaborated on the significant-nexus analysis. Its report listed 165 wetlands purportedly "adjacent" to the Midlothian Creek, and thus "similarly situated" to the Warmke wetlands per the *Rapanos* Guidance. The report did not show or explain these wetlands' proximity to the Midlothian Creek. Nor did the report reflect that the Corps had conducted observation or testing of the 165 wetlands. The district engineer, nevertheless, concluded that the wetlands collectively "decrease sedimentation, pollutants, and flood waters downstream while offering beneficial nutrients and habitat" to the Midlothian Creek and Little Calumet River. He thus found that the Warmke "wetland[s] alone or in combination with the wetlands in the area significantly affect the chemical, physical and biological integrity of the Little Calumet River."

A third appeal followed. The reviewing division engineer agreed that Orchard Hill's claim of the prior-converted-cropland exemption had no merit given the Warmke wetlands' 15-year abandonment. She found lacking, however, the

district engineer's significant-nexus analysis. As she put it, the Corps had "failed to provide the required explanation," and "failed to show its work justifying its summary conclusions." The division engineer remanded with instructions to comply with the *Rapanos* Guidance, which requires the Corps to provide grounds and explanations for its significant-nexus conclusions. The district engineer's subsequent decision, according to the remand order, would be the Corps' final approved jurisdictional determination for the Warmke wetlands.

On remand, in July 2013, the district engineer supplemented his findings with an 11-page report. The supplement asserted that the 165 wetlands considered were all a part of the "Midlothian Creek watershed," though it did not describe that term or map that area. The supplement further explained the significant flooding problems the Tinley Park area had faced in recent years, and, relying on scientific literature and studies, detailed how wetlands help reduce floodwaters. It also described the effect of wetlands generally on reducing pollutants in downstream waters, and the wildlife that inhabited the Warmke wetlands. The supplement's conclusion ultimately mirrored the earlier determination: the Warmke wetlands, alone or in combination with the area's other wetlands, have a significant nexus to the Little Calumet River.

With that final determination made, Orchard Hill turned to federal court. It sought review of the Corps' jurisdictional determination as a "final agency action" under the APA. As such, no discovery occurred, and the parties filed cross motions for summary judgment based on the administrative record. In its decision, the district court examined the Corps' findings—specifically those set forth in the 11-page supplement—and deferred to the Corps' conclusions regarding the

physical, chemical, and biological impact of the Warmke wet-lands on the Little Calumet River. It also decided that the Corps had appropriately applied the five-year-abandonment limitation. The district court therefore granted the Corps' summary-judgment motion and denied Orchard Hill's, enter-ing judgment in favor of the Corps. Orchard Hill appealed.

## II. Standards of Review

We review de novo a district court's decision to grant sum-mary judgment. *Laborers' Pension Fund v. W.R. Weis Co.*, 879 F.3d 760, 766 (7th Cir. 2018). We apply the same standard the district court did in reviewing the Corps' jurisdictional deter-mination—the APA. *Stable Invs. P'ship v. Vilsack*, 775 F.3d 910, 915 (7th Cir. 2015).

Under the APA, a court must set aside an agency determi-nation if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if it is "unsup-ported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E); *see also Rapanos*, 547 U.S. at 786 (Kennedy, J., concurring). Those standards overlap. *See, e.g., Witter v. Commodity Futures Trad-ing Comm'n*, 832 F.3d 745, 749 (7th Cir. 2016). A determination is arbitrary and capricious if it "runs counter to the evidence before the agency, or is so implausible that it could not be as-cribed to a difference in view or the product of agency exper-tise." *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 664, 658 (2007)). A determination is unsup-ported by substantial evidence when the record lacks evi-dence that "a reasonable mind might accept as adequate to support the conclusion." *Id.*; *see also Addis v. Dep't of Labor*, 575 F.3d 688, 690 (7th Cir. 2009). Under either APA standard, the scope of review is "narrow and a court must not substitute its

judgment for that of the agency." *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 547 (7th Cir. 2012); *see also Dana Container, Inc. v. Sec'y of Labor*, 847 F.3d 495, 499 (7th Cir. 2017).

That does not mean the review is "toothless," though. *Pioneer Trail Wind Farm, LLC v. Fed. Energy Regulatory Comm'n*, 798 F.3d 603, 608 (7th Cir. 2015). The Supreme Court has instructed that the "APA requires meaningful review." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999). More specifically, a "reviewing court should not attempt itself to make up for … deficiencies" in an agency's reasoning, nor "supply a reasoned basis for the agency's action that the agency itself has not given." *Zero Zone*, 832 F.3d at 668 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A court, in other words, should deferentially examine an agency's work, but not rubber-stamp it.[5] *Dickinson*, 527 U.S. at 162.

---

[5] Orchard Hill does not protest the APA's standard of review, but it argues that the Corps' determination requires a more demanding inquiry. It invokes the constitutional concerns supposedly implicated by the Corps' claim of jurisdiction to intrastate waters, *but compare Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001) (*SWANCC*), *with Rapanos*, 547 U.S. at 782–83 (Kennedy, J., concurring), and cites *Precon Dev. Corp. v. U.S. Army Corps of Eng'rs*, 633 F.3d 278 (4th Cir. 2011), which reviewed the Corps' compliance with the significant-nexus test de novo, *but see Hawkes*, 136 S. Ct. at 1813 (an approved jurisdictional determination based on a significant-nexus conclusion is subject to the APA). We will not address this argument, because Orchard Hill did not present it to the district court. *See, e.g.*, *Lauth v. Covance, Inc.*, 863 F.3d 708, 718 (7th Cir. 2017) ("we can invoke waiver *sua sponte*").

### III. Discussion

The significant-nexus test requires that the Corps determine on a case-by-case basis whether wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 780. On final remand, and based largely on the 11-page supplement, the Corps concluded that the Warmke wetlands met that standard—both "alone and in combination with other wetlands in the area." That conclusion lacks substantial evidence in the record.

Take the effect of the Warmke wetlands "alone." According to the supplement, wetlands are "nature's kidneys," able to filter out pollutants that would otherwise reach downstream waters. Northeastern Illinois waters are known to suffer relatively high rates of nitrogen, and the Warmke wetlands have a "discrete and confined intermittent flow" to the Midlothian Creek. From this connection, the Corps concluded that the Warmke wetlands have the "ability" to pass pollutants along. But such a "speculative" finding cannot support a significant nexus. *Rapanos*, 547 U.S. at 780; *see also id.* at 786 ("conditional language" like "potential ability" may "suggest an undue degree of speculation, and a reviewing court must identify substantial evidence").

The supplement further pointed out that the almost-13-acre Warmke wetlands are the fourth largest wetlands in the area, making up 2.7 percent of the 462.9 total acres of the wetlands in the Midlothian Creek watershed. According to the supplement, if all the wetlands in the watershed were lost, floodwaters in the area would rise by 13.5 percent. That "rough estimate" also fails to support a significant nexus for

the Warmke wetlands alone. Based on the Corps' figures, loss of the Warmke wetlands would result in a floodwater rise of a fraction of a percent. If the Corps thinks that trivial number significant, it needs to give some explanation as to why. *See, e.g., BP Energy Co. v. Fed. Energy Regulatory Comm'n*, 828 F.3d 959, 965–66 (D.C. Cir. 2016); *accord McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1191 (D.C. Cir. 2004) (an agency that fails to "explain how its knowledge or experience supports" its conclusions is not afforded deference under the APA).

The same goes for the supplement's finding about the potential increase on downstream nitrogen. It reasoned that, if all the watersheds' wetlands were lost, 27 to 51 percent more nitrogen would enter the Midlothian Creek, which would then pollute the Little Calumet River in some un-estimated amount. Assuming there is nitrogen in the Warmke wetlands (which the Corps did not test), they, again, make up just 2.7 percent of the watersheds' total wetlands, and so would presumably account for a small fraction of that increase to the Midlothian Creek (to say nothing of the increase to the navigable-in-fact River). Such a bit impact seems "insubstantial," *Rapanos*, 547 U.S. at 780, and if the Corps thinks otherwise it must provide its reasoning. The supplement further identified certain wildlife that might lose their habitat if the Warmke wetlands were developed. It did not, however, show how that loss of habitat would significantly impact the 11-miles-away Little Calumet River.

Notwithstanding the Corps' claim that the Warmke wetlands "alone" have a significant nexus to the Little Calumet River, both the supplement and the Corps' arguments on appeal focus on the net impact of the 165 total wetlands in the

"Midlothian Creek watershed." As noted, the Corps found that loss of those wetlands would increase the area's peak floodwaters and result in nitrogen loading into the Midlothian Creek. But even if those findings mean something significant to the Little Calumet River, the Corps has not provided substantial evidence for its finding that the 165 wetlands are in fact "similarly situated" such that the Corps can consider their impacts in its jurisdictional analysis in the first place.

Justice Kennedy did not define "similarly situated"—a broad and ambiguous term—but the *Rapanos* Guidance does. It interprets "similarly situated" as "all wetlands adjacent to the same tributary." It in turn defines "adjacent" to mean "bordering, contiguous, or neighboring," and notes that wetlands separated from other waters of the United States by, for example, "man-made dikes or barriers," are still "adjacent wetlands." 33 C.F.R. § 328.3(c). The Corps argues that this interpretation is worth our deference, and we assume it is. *See Precon*, 633 F.3d at 291. Nothing in the record, however, adequately supports the Corps' claim that the 165 wetlands are adjacent to the Midlothian Creek.

The Corps' approved jurisdictional-determination form calls for a listing of all wetlands "adjacent to the tributary (if any)." The Corps listed the 165 wetlands there. The only hint of those lands' proximity to the Midlothian Creek is a column named "Directly abuts? Y/N," under which just four of the 165 lands were affirmatively designated. The list purports to draw its information from a map vaguely titled "National Wetlands Inventory: Tinley Park, Illinois Quadrangle, 1981," which hardly suggests a focus on the Midlothian Creek. That National Wetlands Inventory ("NWI") map does not appear

in the record, and the only NWI map that does shows nowhere near 165 wetlands. The supplement, nevertheless, claimed that NWI data "identifies 165 wetlands in the Midlothian Creek watershed." That claim is unsupported by anything in the record, but even assuming it is correct, the Corps has failed to provide any explanation as to how wetlands in the same watershed are, *ipso facto*, adjacent to the same tributary. Indeed, the so-called Midlothian Creek watershed is 12,626 acres—almost 20 square miles—and that considerable size belies any assumption that lands within the watershed are necessarily, or even likely, adjacent to the Creek.

The Corps offers several responses to this shortcoming. It contends first that Orchard Hill has waived any argument about the failure to identify the other wetlands' adjacency to the Midlothian Creek by not raising that issue at the administrative level. This contention is misguided. Orchard Hill did, in fact, protest the Corps' use of the 165-wetlands list as insufficient during its third appeal. Even had it not, "claims of waiver may themselves be waived." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Orchard Hill argued to the district court, as it does to us, that the Corps has not demonstrated that the 165 wetlands are "similarly situated" because the "list does not describe the wetlands, or their distance to the 13 acres, Midlothian Creek, or the Little Calumet River." In response, the Corps did not raise the waiver argument that it now raises on appeal. It is therefore waived. *See, e.g.*, *United States v. Crisp*, 820 F.3d 910, 912–13 (7th Cir. 2016).

On the merits, the Corps argues that it need not show or explain how each of the 165 wetlands is adjacent to the Midlothian Creek. But accepting this argument, especially on this record, would invite jurisdictional overreach. The significant-

nexus test has limits: the Corps can consider the effects of in-question wetlands only with the effects of lands that are similarly situated. *Rapanos*, 547 U.S. at 780. To do as the Corps did on this record—to consider the estimated effects of a wide swath of land that dwarfs the in-question wetlands, without first showing or explaining how that land is in fact similarly situated—is to disregard the test's limits. Whatever the degree to which the Corps must defend each and every wetland it considers, its approach according to the record was plainly deficient. *Accord Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1374 (D.C. Cir. 2017).

The Corps nonetheless claims we owe its findings deference, citing *Precon* for support. Courts, however, extend no deference to agency decisions that lack record support or explanation, *e.g.*, *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, Office of Foreign Assets Control*, 857 F.3d 913, 927 (D.C. Cir. 2017), and *Precon* does not change that. In *Precon*, the Fourth Circuit gave deference (specifically, *Skidmore* deference) to the Corps' interpretation of "similarly situated" and to its related factual findings. 633 F.3d at 290–92. We have assumed that the first of those things is appropriate here. As to the second, in *Precon*, unlike here, the Corps "provided reasoned grounds" for its similarly-situated findings. *Id.* at 292. The Corps specifically explained that the considered wetlands were historically part of the same drainage system, and others were adjacent to downstream, merged tributaries. *Id.* at 292–93. Even then, the Fourth Circuit gave the Corps' similarly-situated findings deference with reservation. *Id.* at 293 ("We urge the Corps to consider ways to assemble more concrete evidence of similarity before again aggregating such a broad swath of wetlands"). By contrast, the Corps' similarly-situated finding here, lacking as it does record support or explanation, is little

more than administrative *ipse dixit*. *See Bethlehem Steel Corp. v. U.S. Envtl. Prot. Agency*, 638 F.2d 994, 1005 (7th Cir. 1980).

The Corps also submits that it need not "justify its reliance" on the NWI data. This misunderstands the problem. The APA requires some record evidence reasonably adequate to support the finding that the 165 wetlands were similarly situated or adjacent to the Midlothian Creek. *See* 5 U.S.C. § 706(2)(E). The Corps may not need to defend the use of NWI data, but it does need to substantiate its say-so about what the NWI data shows and explain why it matters.

The fairest reading of the record is this: The district engineer reviewed an NWI document that identified 165 wetlands in the Tinley Park area, and assumed that all those wetlands were similarly situated. Maybe the assumption was defensible, but the Corps "does not provide record support for that assumption." *Susquehanna Int'l Grp., LLP v. Sec. and Exch. Comm'n*, 866 F.3d 442, 450 (D.C. Cir. 2017). While we review the Corps' determination narrowly, no amount of agency deference permits us to let slide critical findings bereft of record support. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## IV. Conclusion

This dispute has consumed almost as many years as the Warmke wetlands have acres. In that time, the Corps has not provided substantial evidence that the wetlands and those similarly situated have a significant nexus to the Little Calumet River. We therefore VACATE the district court's grant of summary judgment to the Corps and REMAND with instructions to remand to the Corps for reconsideration of its jurisdiction over the Warmke wetlands.